## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## FAYETTEVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| COASTAL PLAINS PORK, LLC, | Case No. 09-8367-8-RDD |
| Debtor | |

### MOTION OF DEBTOR-IN-POSSESSION FOR EMERGENCY AND FINAL ORDER (1) AUTHORIZING THE DEBTOR-IN-POSSESSION (A) TO ENTER INTO POST-PETITION LOAN AND (B) TO USE CASH COLLATERAL AND (II) GRANTING  RELATED RELIEF

COME NOW Coastal Plains Pork, LLC, Debtor and Debtor-in-possession in the above-captioned cases (the "Debtor"), hereby move (the "Motion") the Court for entry of emergency and final Orders, pursuant to sections 105, 345(b), 361, 363 and 364 of title 11 of the U.S. Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing use of cash collateral securing and entry in to a Revolving Credit Facility with  First National Bank of Omaha ("FNBO" or "Lender")  in the amount of $1.0 million as follows:

    (a)    authorizing the Debtor to use the cash collateral of FNBO;

    (b)    providing adequate protection to FNBO for the use of its cash collateral, as set forth more fully herein;

    (c)    authorizing the Debtor to obtain credit and incur debt pursuant to a $1.0 million Revolving Credit Facility (the "Revolver") which is contemplated by a Revolving Credit Note (the "Note"), secured by a lien on the all of the Debtor's assets 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and with priority, as to

administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code, as set forth more fully herein;

(d)    scheduling a final hearing ("Final Hearing") with respect to each of the foregoing matters.

In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION

1.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and the Motion is proper under 28 U.S.C. § 1408.

2.    The statutory bases for the relief requested herein are sections 105, 345(b), 361, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

3.    On September  2009 (the "Petition Date"), the Debtor commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.    The Debtor has continued in the possession of its property and is operating and managing its business as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.    No request for a trustee or examiner has been made and a creditors' committee has not yet been appointed in this case.

6.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is core within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

7.    Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. § 1408.

8.     The statutory predicates for the relief sought herein are Sections 105, 361, 364, 507, and 552 of the Bankruptcy Code and Rule 4001(c) of the Bankruptcy Rules.

## THE DEBTOR'S BACKGROUND AND BUSINESS

9.     Debtor is a commercial swine production company which was founded in 2003 and is headquartered in Harrells, North Carolina with a satellite office in Sioux Center, Iowa.[2]

10.     It operates swine production farms in the North Carolina counties of Sampson, Duplin, Jones, and Brunswick, and also has a genetic nucleus herd located in Plummerville, Arkansas which produces all of its replacement gilts. Pigs produced from the North Carolina herds are then either sold to the outside market as weaned piglets, or transported to Northwestern Iowa to the Debtor's Finishing Division. The Finishing Division, located in Sioux Center, Iowa, oversees the production process by feeding, or growing, the hogs to slaughter weights of 275 pounds, then marketing them to either Tyson Foods, Inc. or Triumph Foods, Inc. In Iowa, the Company utilizes approximately eighty (80) contract growers located in the counties of Sioux, Buena Vista, Osceola, and O'Brien.

11.     The Debtor's Plummerville, Arkansas facility houses the Company's genetic nucleus herd of 6,300 adult females. The North Carolina operations are comprised of nine facilities housing approximately 21,200 sows that produce the commercial weaned piglets. From North Carolina, the weaned piglets produced go in one of two directions: sent to the Iowa finishing facilities; or sold as weaned piglets on contract or to the open market. The Debtor has operated with a focus on pounds of meat produced per sow per year, as each of the

_____

[2] As mentioned abobve, the Debtor is a North Carolina Limited Liability Company. Its managers are William Sutton, Robert Phillips, George Newkirk, Elijah Morton, Baird Kilpatrick, and Harry Park. These parties have invested significantly in the formation and growth of the Debtor. Their farms are the Debtor's primary sow farms, and they and their spouses, in most cases, have guaranteed the obligations owed by the Debtor to FNBO and other lenders to the Debtor.

21,200 North Carolina sows are expected to produce 5,500 pounds of pork each year. The contract growers in Iowa have a capacity of more than 190,000 pigs at any given time, for production to slaughter. Combined, the Iowa facilities are capable of producing 350,000 market animals annually.

12.    In 2008 feed costs skyrocketed, with corn reaching an all-time high of $8 per bushel, which raised the Debtor's growing cost to as high as 60 cents per pound. This alone created a loss of approximately $20 per hog sent to market. Because of this sharp rise in feed costs, the Debtor experienced losses of approximately $10 million in 2008. It should be noted that the sharp rise in feed costs has negatively affected the entire industry, which currently teeters on the edge of disaster.

13.    In 2009 the economic outlook has grown even darker as an outbreak of the H1N1 flu virus was erroneously referred to as "Swine flu." Even though this virus is spread by humans and not by hogs or pork, the outbreak caused a sharp drop in pork sales by domestic consumers and seriously damaged the international export market. While feed prices have stabilized some in recent months, the demand for pork remains extremely low while supply has remained high. During most of 2009, the Debtor has lost approximately $30 per hog sent to market.

14.    The Debtor has sought, and continues to seek, additional capital to get it through this difficult period, with hopes that the pork market will return to profitability by the third quarter of 2010. However, the Debtor has lost a significant amount of money in 2009 and does not have the capital available to continue operations. Due to the pressures of the market and creditors, the Debtor has determined that the Chapter 11 filing is required to liquidate its

swine herd in an orderly fashion that insures that the livestock is fed, safely transported and sold at the best market price.

15.    Mr. R. Greg Brown has been working with the Debtor as the President since October of 2007.  He has done an excellent of job of managing the Debtor through a very difficult situation and has the confidence of the Debtor and FNBO to continue working with the Debtor through the liquidation process.

16.    In order to liquidate its swine herd and to obtain the best possible prices at the least cost to the estate, the Debtor will require additional funding from FNBO as will be discussed herein.

## PRE-BANKRUPTCY SECURED LENDING BACKGROUND

17.    Prior to the Petition Date, the FNBO made loans and advances to the Debtor pursuant to the following documents.

(i)    That certain Credit Agreement dated as of October 8, 2008, as amended by the: (a) First Amendment to Credit Agreement dated April 30, 2009; (b) Second Amendment to Credit Agreement dated June 30, 2009; (c) Third Amendment to Credit Agreement dated July 31, 2009; (d) Fourth Amendment to Credit Agreement dated August 11, 2009; and (e) Fifth Amendment to Credit Agreement dated August 27, 2009 (the "Pre-Petition Credit Agreement").

(ii)    That certain Revolving Credit Note dated as of October 8, 2008 as amended by the: (a) First Amendment to the Revolving Credit Note dated April 30, 2009; (b) Second Amendment to the Revolving Credit Note dated June 30, 2009; (c) Third Amendment to the Revolving Credit Note dated July 31, 2009; (d) Fourth Amendment to the Revolving Credit

Note dated August 11, 2009; and (e) Fifth Amendment to the Revolving Credit Note dated August 27, 2009 (the "Pre-Petition Credit Note").

(iii)    That certain LOC Backed Loan Note dated October 8, 2008 as amended by the: (a) First Amendment to LOC Backed Loan Note dated April 30, 2009; (b) Second Amendment to LOC Backed Loan Note dated July 31, 2009; and (c) Third Amendment to LOC Backed Loan Note dated August 11, 2009 (the "LOC Backed Note").  The letters of credit securing the LOC Backed Note were provided by certain of the guarantors are expected to be called, thus resulting in full payment of the LOC Banked Note through non-debtor funds.

18.    The obligations of the Debtor under the Pre-Petition Credit Agreements have been guaranteed by: (a) William B. Sutton and Karen T. Sutton, (b) George W. Newkirk and Rachel W. Newkirk, (c) Robert L. Phillips, (d) John W. Kilpatrick and Susan F. Kilpatrick, (e) Jack C. Bissette and Rose K. Bissette, (f) John J. Burney, III and Zina S Burney, (g) Elijah T. Morton and Violet R. Morton. (h) James E. Maides, (i) Harry C. Parker and Susan Parker, and (j) Russell L. Brock and Joy F. Brock.

19.    The Debtor acknowledges that as of the Petition Date (a) the aggregate principal amount of approximately $15,215,000.00 was outstanding in respect of loans made by the FNBO under the to the Pre-Petition Credit Agreement, and  (b) the aggregate principal amount of approximately $1,700,000 was outstanding in respect of loans made under the LOC Backed Note (all such amounts, together with interest on the foregoing and fees, expenses and other charges incurred in connection therewith as provided in the  "Pre-Petition Obligations"). The Debtor acknowledges, stipulates and agrees the Pre-Petition Obligations are valid, past due and owing; and, that Debtor has no defense thereto or counterclaim against Lender of any nature.

20.     The Debtor acknowledges that, to secure the Pre-Petition Obligations, the Debtor has granted the FNBO first priority liens and security interests (collectively, the "Pre-Petition Liens") in substantially all of the Debtor's personal property, including the livestock and the proceeds therefrom, including without limitation: that certain Security Agreement dated October 8, 2008 and that certain Account Control Agreement dated September 23, 2008. As further security, the Debtor granted to FNBO a junior deed of trust in Debtor's real property pursuant to that certain Real Estate Deed of Trust dated September 4, 2009 and recorded in the Sampson County Register of Deeds, Book 01751, Page 0723. (Collectively, the security agreement and junior deed of trust are referred to as the "Pre-Petition Collateral".) The Debtor acknowledges, stipulates and agrees the Pre-Petition Liens in the Pre-Petition Collateral are valid, perfected and not subject to any defense by Debtor.

21.     Prior to the Petition Date, Cooperative Credit Company, made loans and advances to the Debtor (collectively, the "CCC Pre-Petition Agreements") pursuant to the following documents.

(i)     That certain Agricultural Loan Agreement dated as of March 1, 2009, Loan Number 1116107091 in principal amount of $2,000,000, and that certain Agricultural Loan Agreement also dated March 1, 2009, Loan Number 1116207092 in the principal amount of $1,000,000 (the "CCC Pre-Petition Loan Agreements").

(ii)     That certain Promissory Note dated as of March 1, 2009, Loan Number 1116107091 in principal amount of $2,000,000, and that certain Promissory Note also dated March 1, 2009, Loan Number 1116207092 in the principal amount of $1,000,000 (the "CCC Pre-Petition Notes").

22.     The obligations of the Debtor under the CCC Pre-Petition Agreements have been guaranteed by: (a) William B. Sutton and Karen T. Sutton, (b) George W. Newkirk and Rachel W. Newkirk, (c) Robert L. Phillips, (d) John W. Kilpatrick and Susan F. Kilpatrick, (e) Jack C. Bissette and Rose K. Bissette, (f) John J. Burney, III and Zina S Burney, (g) Elijah T. Morton and Violet R. Morton. (h) James E. Maides, and (i) Harry C. Parker and Susan Parker.

23.     The Debtor acknowledges that as of the Petition Date the aggregate principal amount of approximately $3,000,000 was outstanding in respect of loans made by CCC to the Debtor pursuant to the CCC Pre-Petition Agreements (the "CCC Pre-Petition Indebtedness").

24.     In order to secure the CCC Pre-Petition Indebtedness, Debtor has granted to CCC liens and security interests (collectively, the "CCC Pre-Petition Liens") in substantially all of Debtor's personal property, including the livestock, wherever located, then owned or thereafter acquired or arising, and the proceeds, products, rents and profits of all of the foregoing (collectively, the "CCC Pre-Petition Collateral"), including without limitation: that certain Agricultural Security Agreement dated as of March 1, 2008, Loan Number 1116107091, and that certain Agricultural Security Agreement also dated March 1, 2009, Loan Number 1116207092 executed by Debtor in favor of CCC.   All of the CCC Pre-Petition Collateral is collateral for all of the CCC Pre-Petition Indebtedness.

25.     Pursuant to that certain Intercreditor Agreement dated March 1, 2009 by and between the FNBO, CCC and Debtor, CCC's Pre-Petition Loan Agreements and Pre-Petition Liens are subordinate and junior to the FNBO's Pre-Petition Loan Agreements and Pre-Petition Liens.

26.    Prior to the Petition Date, The North Carolina Agricultural Finance Authority, made loans and advances to the Debtor (collectively, the "NC Ag Pre-Petition Agreements") pursuant to the following documents.

(i)    That certain Loan Agreement dated as of April 2, 2009, in principal amount of $3,000,000 (the "NC Ag Pre-Petition Loan Agreement").

(ii)    That certain Promissory Note dated as of April 2, 2009, Loan Number 600-92720 in principal amount of $2,000,000, and that certain Promissory Note also dated April 2, 2009, Loan Number 600-92730 in the principal amount of $1,000,000 (the "NC Ag Pre-Petition Notes").

27.    The Debtor acknowledges that as of the Petition Date the aggregate principal amount of approximately $3,000,000 was outstanding in respect of loans made by NC Ag to the Debtor pursuant to the NC Ag Pre-Petition Agreements (the "NC Ag Pre-Petition Indebtedness").

28.    In order to secure the NC Pre-Petition Indebtedness, Debtor has granted to NC Ag a junior deed of trust in Debtor's real property pursuant to that certain North Carolina Deed of Trust dated April 2, 2009 and recorded in the Sampson County Register of Deeds, Book, 01738, Page 0293  (the "NC Ag Pre-Petition Deed of Trust).  As further security, and pursuant to the NC Ag Pre-Petition Agreements, NC Ag was given junior deeds of trust on six sow farms owned by various members of the Debtor, a security interest in the equipment and fixtures located at those six sow farms and personal guaranties from various individual members of the Debtor (the "Member Deeds of Trust and Fixture Liens")

29.    Pursuant to that certain Tri-Party Agreement dated April 2, 2009 by and between the FNBO, NC Ag and Debtor, other than the Member Deeds of Trust and Fixture

Liens, NC Ag's Pre-Petition Loan Agreements and Pre-Petition Deed of Trust are subordinate and junior to the FNBO's Pre-Petition Obligations and Pre-Petition Liens.

30.    Prior to the Petition Date, Four Oaks Bank & Trust Company ("Four Oaks") loaned the Debtor the principal amount of $656,500 to finance the acquisition of a feed mill and office building located in Harrells, North Carolina (this is the only real property owned by the Debtor). To secure this indebtedness, the Debtor granted a first priority deed of trust in the real property pursuant to that certain Real Estate Deed of Trust dated December 12, 2005, and recorded in the Sampson County Register of Deeds, Book 01610, Page 0973, an Assignment of Leases and Rents dated December 12, 2005 and a UCC-1 Financing Statement on the fixtures and equipment located at the real property dated February 2, 2006.  On February 28, 2006, Four Oaks assigned all rights, title and interest it held in the Deed of Trust, Assignment of Rents and UCC-1 Financing Statement to AGSTAR Financial Services, AGA ("AGSTAR").

31.    The Debtor acknowledges that as of the Petition Date the aggregate principal amount of approximately $358,814.97 was outstanding in respect of the loan made by Red Oaks to the Debtor and subsequently assigned to AGSTAR (such amount, together with interest on the foregoing and fees, expenses and other charges incurred in connection therewith, the "AGSTAR Pre-Petition Indebtedness").

32.    In addition to the above secured creditors, two creditors who provide feed for the livestock in Iowa, Cooperative Elevator Association and Farmers Cooperative Society have filed UCC-1 Financing Statements pursuant to Iowa Code Chapter 570A.  Both Cooperative Elevator Association and Farmers Cooperative Society filed UCC-1's with the North Carolina Secretary of State on June 30, 2009, July 31, 2009 and August 31, 2009 alleging liens on

10

livestock located on those certain Iowa grower farms where they provided feed. On information and belief, these liens are invalid as certified requests were not served upon the FNBO as required by Iowa Code Section 570A.2, and in any event, are junior and subordinate to the FNBO's Pre-Petition Liens.

33.    Except with regard to those liens held by the FNBO, the Debtor reserves any and all of their respective rights regarding the liens asserted against their respective assets, and the identification of the existence of such purported liens is not an admission as to validity, perfection, priority or the extent of such lien or interest.

### EXECUTORY CONTRACTS, UNSECURED DEBT, AND ASSETS

34.    As of the Petition Date, Debtor was utilizing a total of 93 contract growers in Arkansas (4), Iowa (80) and North Carolina (9). Each of the growers has an executory contract with the Debtor. As the livestock are sold, the growers will be paid based upon the amount they are due for the animals being sold, but not for any past due amounts that were not paid when animals were released by the growers. All contracts will be rejected when the animals are removed from the grower's premises.

35.    As of the Petition Date, Debtor's unsecured indebtedness totals approximately $3,532,646.12, not including any rejection damages or deficiency claims to secured creditors discussed above.

36.    The livestock and real estate owned by the Debtor, as well as miscellaneous equipment are expected to bring approximately $12,000,000 after expenses of liquidation are paid.

## NEED FOR POST-PETITION FINANCING AND
## USE OF CASH COLLATERAL

37.    By this Motion, the Debtor seek the entry of the Interim Order and the Final Order regarding the relief requested herein. Such Interim and Final Orders, *inter alia,* will authorize the Debtor to use cash collateral in an aggregate amount of $3.2 million for the period ending October 11, 2009 on an interim basis, and approximately $15 million on a final basis, in accordance with the Approved Budget attached as Exhibit "A."

38.    The Approved Budget enumerates expenses including feed, transportation for the animals, grower payments and other expenses directly related to the animals.  General and administrative costs include but are not limited to, employee payroll and other benefits, corporate overhead, professional fees, and other expenses related to operating the business. Use of the cash collateral will permit sale of the livestock to occur over a twenty-six (26) week period and a net of $12,000,000 is projected to be generated from the sale effort, which will be remitted to Lender as received to be applied to reduce the Pre-Petition Obligations, and provide Lender adequate protection during the 26 week budgeted period.

39.    Absent use of cash collateral securing FNBO, the Debtor will be unable to provide feed and care for its livestock much less wind down the business in an orderly manner. FNBO and other creditors, as well as the livestock, will suffer immediate and irreparable harm.  A sale of the animals within a short period of time will result in a severe reduction in sale proceeds due to the market being flooded with animals. Other producers are also liquidating their sows and weaned pigs, so the market is already saturated.

40.    Due to projected cash flow shortfalls that will occur as expenses become due before sales are accomplished, the Debtor will require the Revolver in the maximum amount of

$1.0 million to enable it to meet expenses on a timely basis.   The Revolver may only be needed for the first month to six weeks of the liquidation process until the proceeds from the sale of livestock begins outpacing the expenses of the reduced operation.

41.    The use of cash collateral and availability of the Revolver will provide the Debtor with the necessary cash and credit support needed to maximize the value of the livestock. Of almost equal importance is the sense of confidence that such financing and use of cash collateral will instill in the Debtor's suppliers, customers and employees.  All vendors are requiring payment in advance or upon delivery because many, particularly the feed mills, are owed significant sums.

## DESCRIPTION OF PROPOSED POST-PETITION FINANCING AND USE OF CASH COLLATERAL

42.    Set forth below is a summary of the most significant terms and conditions of the proposed Revolver which is attached hereto in substantially final form as Exhibit "A". Furthermore, attached as Exhibit "B" is the Approved Budget prepared by the Debtor:

- Borrowing:  Subject to the other terms and conditions of the Revolver, Lender hereby agrees to make available to Debtor the DIP Facility in the total amount of up to $1.0 million consisting of a revolving credit facility that represents additional credit to Debtor to fund its ongoing working capital needs and other general business purposes, but only for the items allowed herein and under the Approved Budget and Permitted Variance (the "Revolving Credit Facility").

- Priority and Liens: The Lender shall have a super-priority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out Expenses, a lien and security interest in all unencumbered property of Debtor under Section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable and fully perfected, and first priority priming liens (collectively, the "Post-Petition Liens") in all Collateral of the Debtor (or any successor trustee or other estate representative in the Bankruptcy Case), and all "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtor (or any successor trustee or other estate representative in the Bankruptcy Case), of any kind or nature whatsoever to secure the Obligations, subject and subordinate only to the Permitted Priority Liens on which Lender shall be

13

granted and hold a lien pursuant to Section 364(c)(3) of the Bankruptcy Code junior only to such Permitted Priority Liens.  The Collateral will include all assets of the Debtor as specifically listed in the Revolver and avoidances and recovery actions under Chapter 5 of the Bankruptcy Code that Debtor may have against any party.

- Permitted Priority Liens: means mortgages, deeds of trust and/or statutory liens which as of the Petition Date satisfied all the following criteria: (a) had attached to the Debtor's real estate or personal property; (b) were valid, existing, recorded and perfected; and (c) had priority over the Lender's Pre-Petition Liens.

- The Post-Petition Liens shall not at any time be (i) made subject or subordinate to, or made pari passu with, any other Lien or claim existing as of the Petition Date, or created under Bankruptcy Code Sections 363 or 364 or otherwise, other than the Permitted Priority Liens or (ii) subject to any Lien that is avoided and preserved for the benefit of the Debtor's estate under Bankruptcy Code Section 551.

- Carve-Out Expenses means amounts payable pursuant to 28 U.S.C. §1930(a)(6), all fees required to be paid to the Clerk of the Bankruptcy Court, and the allowed reasonable fees, expenses and costs of attorneys, accountants and other professionals retained in the Bankruptcy Case by Debtor or any official committee of unsecured creditors pursuant to Bankruptcy Code Sections 327, 328, 330, or 331 (the "Bankruptcy Professionals") and owed pursuant to such Bankruptcy Professionals engagement letters (other than any success fees, transaction fee, or similar fees) to the extent provided in and permitted under the Approved Budget for such respective Bankruptcy Professionals in the Bankruptcy Case, which are actually incurred prior to the Termination Date, to the extent approved by the Bankruptcy Court pursuant to Section 330 or 331 of the Bankruptcy Code, provided however, that none of the Carve-Out Expenses may be used by any such official committee or Debtor to investigate, contest, or otherwise challenge the validity, priority or enforceability of the Lender's Pre-Petition Loans, Pre-Petition Lender Claim, Pre-Petition Liens or Post-Petition Liens.  Provided further, that the Carve-Out Expenses may not exceed two hundred fifty thousand dollars ($250,000) in the aggregate, of which $25,000 shall be available for any Professional employed by an official committee of unsecured creditors.

- The "Interest Rate" will be an annual rate of interest (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the higher of: (a) the sum of (i) the Base LIBOR Rate multiplied by the Statutory Reserve Rate plus (ii) ten percent (10.00%); and (b) ten percent (10.00%).

- Debtor shall pay to Lender an up front fee of $75,000 and a non-use fee on the Revolving Credit Facility, which shall accrue at 100 basis points (1.00%) per annum on the average daily unused amount of the Revolving Credit Commitment during the period from the Closing Date until the Termination Date. All accrued non-use fees shall be due and payable on the Termination Date. All non-use fees shall be computed for the actual number of days elapsed on the basis of a year consisting of three hundred sixty (360) days, including the Closing Date and excluding the Termination Date.

- The entire outstanding principal balance of the Revolving Credit Loans, together with all unpaid accrued interest thereon, shall be due and payable on the Termination Date.

- Termination Date means the earliest of: (a) the date seven (7) days after Lender gives written notice to Debtor that it has determined in its sole discretion, to cease making Advances hereunder; (b) the expiration of the Approved Budget; (c) the occurrence of an Event of Default which, if subject to cure, has not been cured by the expiration of any notice period relating thereto; (d) the date on which the Loan has been declared or automatically has become due and payable (whether by acceleration or otherwise); (e) the date on which any party institutes any lawsuit, adversary proceeding or contested matter challenging the validity, allowability, or priority of the Loan or Pre-Petition Liens or the Post-Petition Liens on the Collateral; and (f) the consummation of a transaction or series of transactions culminating in the sale or disposition of all or substantially all of Debtor's assets. Lender may extend the Termination Date by giving written notice to Debtor of such extension. No extension by Lender shall be deemed effective or enforceable unless in writing.

43. The Debtor will use cash collateral during the period from the Petition Date through March 14, 2010, based solely for the expenses, on the Approved Budget attached hereto as Exhibit B. All post-petition collections will be deposited (with the proceeds of the post-petition loans described above) into a deposit account maintained with FNOB (the "DIP Account") on which FNBO would have a senior lien. Post-petition payments would be funded out of the DIP Account in accordance with the Budget. After the need for the Revolver ends, FNBO will apply excess cash collateral to the Pre-Petition Obligations, first to accrued and unpaid interest and expenses, and then to principal. Terms set forth in the Revolver which also provide FNBO adequate protection for use of the cash collateral are as follows:

15

-    The Debtor shall maintain or cause to be maintained "all risk" insurance on its Property against fire, casualty and such other hazards in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Debtor or which Debtor has historically used (and which is reasonably acceptable to Lender). The policies of all such insurance shall contain standard lender loss payable and additional insured clauses issued in favor of Lender pursuant to which all losses thereunder shall be paid to Lender as Lender's interests may appear. Such policies shall expressly provide that the requisite insurance cannot be materially altered or canceled without thirty (30) days prior written notice to Lender and shall insure Lender notwithstanding the act or neglect of the insured.

-    Debtor shall, during regular business hours upon reasonable advance notice, permit any of Lender's officers or other representatives to visit and inspect Debtor's Property, to examine and audit all of Debtor's books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and such matters with its managers, officers, employees and independent certified public accountants and attorneys.

-    Debtor's current management team shall remain in place to operate Debtor's business and to negotiate and conduct any sales or other dispositions of Debtor's assets, unless a replacement management team satisfactory to Lender is installed after appropriate written notice by current management to Lender. Debtor's management and Debtor's equity holders shall cooperate fully in the efforts to solicit potential purchasers of Debtor's assets and in effectuating or consummating one or more sales of Debtor's assets, in either case on terms acceptable to Lender.

.    Debtor shall not establish any new deposit, checking, savings, securities, investment, hedging, commodity trading or other similar accounts, maintain any account other than those accounts approved by the Lender and/or currently in place at FNBO, deposit proceeds from the sale of Collateral in any account other than a deposit account approved by FNBO or permit the cash balance of the accounts All non-FNBO accounts hereto that are maintained with

Financial institutions other than Lender shall not have an aggregate balance limit in excess of one hundred thousand dollars ($100,000).[2]

-    Financial Statements and Reports:

    (i)    as soon as available, but in any event within five (5) days after the end of each week the actual weekly financial information compared to each line item in the Budget for each such week;

    (ii)    as soon as available, but in any event within fifteen (15) days after the end of each calendar month, internally prepared financial statements of Debtor for such calendar month, which present fairly Debtor's financial condition, including balance sheet, statement of operations, statement of members' equity and statement of cash flows, prepared in accordance with GAAP (subject to the absence of footnotes);

    (iii)    as soon as available, but in any event within five (5) days after the end of each week, a schedule of inventory of Debtor as of the end of such week; and

    (iv)    such other data, reports, statements and information (financial or otherwise) as Lender may reasonably request.

## RELIEF REQUESTED

44.    By this Motion, the Debtor request entry of an Order (i) authorizing them to obtain requested post-petition secured financing pursuant to section 364 of the Bankruptcy Code by entering into the Revolver, (ii) authorizing the Debtor to grant FNBO protections under sections 364(c) and (d) of the Bankruptcy Code, including a lien on unencumbered assets and a perfected first priority lien on all assets, subject to the Permitted Priority Liens and the Carve-Out Expenses, a superpriority administrative expense claim, (iii) approving the use of cash collateral and the provision of adequate protection to FNBO for the sale of its collateral; and (iv) setting the final hearing on the relief requested herein pursuant to Bankruptcy Rule 4001(c).

3

---

[2] The Debtor's cash management system and bank accounts are described in greater detail in the Motion for Order Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms and Records, and (III) Waiver of Deposit i

## BASIS FOR RELIEF REQUESTED

### A.    DIP Loan

45.    Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business and (c) obtain credit with specialized priority or with security. If a debtor in possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to a superpriority administrative expense status or is secured by a lien on the debtor's property, or a combination of the foregoing.

46.    The evidence at the interim hearing will show that, since substantially all of the Debtor's assets are already encumbered, and given the Debtor's current financial condition, it is possible for the Debtor to obtain credit on either an unsecured basis, or solely on the basis of granting junior liens. Indeed, the terms proposed by the Guarantors represent the only financial package currently available to the Debtor. As will be shown, the potential sources of an adequate DIP Financing for the Debtor, obtainable on an extremely expedited basis and on reasonable terms, were practically nonexistent. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Federal Say, and Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).

47.    A debtor need only demonstrate "by a good faith effort that credit was not available" without the protection of section 364. Id. The Debtor believes that the evidence at the interim hearing will satisfy the requirement of section 364 that credit on other terms was not available to the Debtor.

18

48.    The Debtor has been unable to obtain adequate secured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or secured credit in the amount and on as favorable terms as are contemplated herein.

**B.    Use of Cash Collateral**

49.    The Debtor, pursuant to section 363(c)(2) of the Bankruptcy Code, hereby requests authority, immediately and on an ongoing basis, to use the cash proceeds of its livestock including without limitation, the collection of any accounts, and the cash proceeds thereof to pay the expenses of operating the business and other administrative expenses during the pendency of the case.

50.    The Debtor's use of property of the estate is governed by section 363 of the Bankruptcy Code, which provides in pertinent part:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the [debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(l).

51.    Section 363(c)(2) permits the Debtor in possession to use, sell or lease cash collateral only if either (i) each entity that has an interest in such cash collateral consents; or (ii) the court, after notice and hearing, authorizes such use, sale or lease in accordance with the provisions of this section. 11 U.S.C. § 363(c)(2). If the secured creditor does not consent to the use of its cash collateral, the Court can authorize the debtor to use such cash collateral under section 363(c)(2)(B) if the court determines that the Debtor has provided "adequate protection" of the secured creditors' interests. 11 U.S.C. § 363(e).

50.    FNBO's asserted secured interest and lien in cash collateral is adequately protected by the fact that the proceeds will be used to care and feed the livestock and provide for transport of the animals for sale. The overhead structure of the Debtor is as streamlined as possible to effectuate the orderly liquidation of the livestock over the next twenty-six (26) weeks or less.

### C.    Waiver of Requirements of Section 345(b) and Local Rule 2070-1

52.    As described herein, the Debtor proposes to continue its existing bank accounts with FNBO which shall be denominated "DIP Accounts" in which the Guarantors will deposit the proceeds of the DIP Loan.  Thus, the Debtor anticipates that the account balance for the DIP Accounts will exceed $100,000.

53.    Bankruptcy Code section 345(a) authorizes deposits or investment of money "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." For deposits or investments that are not "insured or guaranteed by the United States or by a department agent or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety. 11 U.S.C. § 345(b)

54.    This section also permits a court to relieve a debtor in possession from these restrictions for "cause." In determining whether "cause" is present, courts consider a "totality of the circumstances" test utilizing the following factors:

    a.    The sophistication of the debtor's business;

    b.    The size of the debtor's business operations;

c.    The amount of investments involved;

d.    The bank ratings (Moody's and Standard and Poor's) of the financial institutions where debtor-in-possession funds are held;

e.    The complexity of the case;

f.    The safeguards in place within the debtor's own business of insuring the safety of the funds;

g.    The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

h.    The benefit to the debtor;

i.    The harm, if any, to the estate; and

j.    The reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

In re Serv. Merch. Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (citations omitted).

55.    Local Rule 2070-1 continues to reference a maximum balance of $100,000.00, even though federal deposit insurance now covers amounts up to $250,000.00. The Debtor request a waiver of these requirements relating to $100,000.00 out of an abundance of caution. The Debtor further seek a waiver of the deposit requirements to the extent that the account balance of the DIP Account exceeds the $250,000.00.

56.    Cause exists here to grant a waiver of the section 345 requirements for several reasons. First, the amount of cash flowing through the accounts is relatively large. Second, the Debtor's DIP Account will be held at FNBO, a bank with strong ratings. Third, the Debtor's obligations to FNBO greatly exceed the value of the funds on deposit with the bank. Fourth,

federal deposit insurance is now available to funds up to $250,000.00. Therefore, the Court may grant a waiver of the section 345 requirement.

### D.    Interim Authorization

57.    Bankruptcy Rule 4001 permits a court to approve a debtor's request for financing and use of cash collateral on an interim basis following the filing of a motion requesting authorization to use cash collateral and financing, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g. Simasko*, 47 B.R.. at 449; *see also Ames*, 115 B.R. at 38.

58.    Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Bankruptcy Court conduct an expedited preliminary hearing on this Motion and authorize the Debtor to use $3,200,000 in cash collateral and borrow up to $500,000 under the Revolver on an interim basis through October 11, 2009, pending entry of a Final Order, in order to maintain and finance the ongoing operations of the Debtor, and avoid immediate and irreparable harm to the Debtor's estate and all parties-in-interest, and schedule a hearing to consider entry of the Final Order.

59.    The Debtor further submits that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

60.    To successfully implement the foregoing the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) with respect of the Interim Order and a waiver of the ten-day stay under Bankruptcy Rule 6004(h).

## NOTICE

61.    The Debtor requests the Court's approval to serve this Motion by facsimile and Overnight Mail on: (a) FNBO, the Debtor's primary secured lender; (b) Cooperative Credit Company; (c) The North Carolina Agricultural Finance Authority; (d) AGSTAR Financial Services (e) the top twenty unsecured creditors; (f) the Bankruptcy Administrator for the Eastern District of North Carolina; and (g) the Guarantors, and believe this notice is sufficient and that such service shall constitute adequate notice of a hearing on the Motion; and

62.    No previous application for the relief sought herein has been made to this or any other court.

63.    The Debtor requests that this Court retain jurisdiction to hear and determine all matters arising from or related to this Motion.\Except as specifically set forth herein, nothing in this Motion should be construed as (a) an admission as to the validity or priority of any claim against the Debtor, (b) a waiver of the Debtor's rights to dispute any claims, or (c) an approval or assumption of any agreement, contract or lease, pursuant to Section 365 of the Bankruptcy Code.

WHEREFORE, the Debtor respectfully requests that this Court enter an order granting the relief requested herein and that it grant the Debtor such other and further relief as is just and proper.

Dated: September 28, 2009

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:  /s/ Terri L. Gardner
        Terri L. Gardner
        N.C. State Bar No. 9809
        Joseph M. Lischwe
        N.C. State Bar No. 13308
        Post Office Box 30519
        Raleigh, NC 27622-0519
        (919) 329-3000
        Attorneys for Coastal Plains Pork, LLC

# EXHIBIT A – REVOLVING CREDIT AGREEMENT

# EXHIBIT B – APPROVED BUDGET

.